UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GLORIA TRENT,                          )
                                       )
                    Plaintiff,         )
                                       )
           v.                          )        No.  4:05CV741 TIA
                                       )
JO ANNE B. BARNHART, Commissioner      )
of Social Security,                    )
                                       )
                    Defendant.         )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

On March 14, 2003, Claimant Gloria Trent filed an application for Supplemental Security

Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.

(Tr. 210-13) and for Disability Insurance Benefits pursuant to Title II of the Social Security Act,

42 U.S.C. §§ 401, et seq.  (Tr. 46-48).[1]  In the Claimant Questionnaire completed by Claimant's

daughter on March 26, 2003, and filed in conjunction with the applications, Claimant stated that

her disability began on October 1, 2002, due to major depression, headaches, high blood pressure,

and high cholesterol.  (Tr. 67-70).  On initial consideration, the Social Security Administration

denied Claimant's claims for benefits.  (Tr. 38-42, 214-18).  Claimant requested a hearing before

_____

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 13/filed July 18, 2005).

an Administrative Law Judge ("ALJ").  (Tr. 43-44).  On September 22, 2004, a hearing was held

before an ALJ.  (Tr. 221-41).  Claimant testified and was represented by counsel.  (Id.).

Thereafter, on October 14, 2004, the ALJ issued a decision denying Claimant's claims for

benefits.  (Tr. 11-24).  On March 9, 2005, the Appeals Council found no basis for changing the

ALJ's decision and denied Claimant's request for review of the ALJ's decision.  (Tr. 5-9).  The

ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on September 22, 2004

#### 1.  Claimant's Testimony

At the hearing on September 22, 2004, Claimant testified in response to questions posed

by the ALJ and counsel.  (Tr. 221-42).  Claimant lives in St. Louis with her husband and two

daughters, ages 19 and 12, in a two-family house.  (Tr. 224).  Claimant stands at five-feet two and

one-half inches and her weight has been fluctuating down recently.  (Tr. 224).  Claimant explained

that she has experienced a loss of appetite.  (Tr. 225).  Claimant completed some college and is

right-handed.  Claimant studied and became certified as a nurse assistant.  (Tr. 225-26).  Claimant

is also a certified truck driver by Midwest Training Center.  (Tr. 226). Claimant testified that she

has Medicaid and receives AFDC and her husband receives student rent.  (Tr. 225).

Claimant testified that she last worked part-time as a student worker at a Forest Park

Community College.  (Tr. 226).  She answered phones, directed students to the nurse, and handed

out medications.  (Tr. 226).  Claimant testified that she had other part-time jobs at Forest Park

Community College.  (Tr. 227).  In her last full-time job, Claimant worked as a temp service at

Sharrett Technology programming cell phones by calling customers, reminding them of their

payments, asking if they wanted to add minutes to their phone contracts, and programming their phones. (Tr. 227, 230). Claimant had to quit the job after two months due to illness. (Tr. 227-28). Claimant testified that she worked for a few months at Alcoa as a shuttle bus driver, but she walked off the job after being denied permission to go see her daughter after being injured in an accident. (Tr. 228). Claimant testified that she has sometimes worked as a cashier. (Tr. 228). Claimant testified that she has also worked for six months in 1996 as a truck driver for Prime Incorporation driving an eighteen-wheeler. (Tr. 229). Sitting and driving for long hours caused Claimant stress so she quit the position. (Tr. 229). Claimant worked at Oaks Hotel doing laundry for a couple of years in the 1980s, but the hotel closed. (Tr. 229-31). Claimant worked for a temp service at different places. (Tr. 230). Claimant worked at Linens and Things for one day doing inventory and placing things in order. (Tr. 230). When she worked, Claimant experienced problems with her supervisors and coworkers because of her depression. (Tr. 240).

Claimant testified that her headaches, lack of concentration, and fatigue preclude her from working. (Tr. 231-32). Claimant testified that she experiences headaches every day for a couple of hours and pushing her head helps alleviate the headaches. (Tr. 232). Medications have not helped alleviate her headaches. (Tr. 232). Claimant experiences concentration problems when she reads starting after she was hit in the head in the 1980s. (Tr. 232-33). Claimant testified that she experiences fatigue. (Tr. 233).

Claimant testified that a psychiatrist treats her for depression and anxiety. (Tr. 233). Claimant cries every day due to sadness and expressed a desire not to live. (Tr. 233). Claimant takes medication for depression but experiences side effects including fatigue and drowsiness. (Tr. 234). Claimant testified that she is uncertain whether the medication helps. (Tr. 234).

Claimant's psychiatrist, Dr. Larice, prescribed Claimant a new medication. (Tr. 240-41).

Claimant started seeing him in April and has been treated by Dr. Larice twice. (Tr. 241).

Claimant has been seeing her treating physician, Dr. Flanigan, for a year almost every week. (Tr.

241). Claimant does not sleep through the night, but wakes up around 2:00 a.m. and falls back to

sleep around 6:30 a.m. and wakes up again around 8:30 a.m. (Tr. 234-35). Throughout the day,

Claimant falls asleep for an hour or two and then is awake for an hour or two. (Tr. 235).

Claimant sleeps for at total of twelve hours a day. Claimant sometimes has problems bathing and

getting dressed. Sometimes Claimant does not dress, but stays in her pajamas all day. (Tr. 235).

Claimant testified that her husband and her daughter do all of the household chores including

taking out the trash and vacuuming. (Tr. 236). Claimant cleaned her room the day before the

hearing. Claimant helps do the dishes and the cooking. Although Claimant has a driver's license,

she does not drive because the last time she drove, she blacked out behind the wheel. (Tr. 236).

Claimant attends church twice a month and assists her daughter with the grocery shopping. (Tr.

237).

As to her daily activities, Claimant testified that she reads the Bible and watches television.

(Tr. 237-38). Claimant has problems remembering past events or something she just read. (Tr.

238). Although the family might be in the house, Claimant likes to be in her own room. (Tr.

239). Claimant testified that she experiences problems blacking out. (Tr. 239).


## III.    Medical Records

Dr. Aqeeb Ahmad treated Claimant on December 2, 2000, during an office visit. (Tr.

86A). Claimant reported having a headache, pharyngitis, and nose congestion. Dr. Ahmad

prescribed Allegra, a nasal puff, Midrin, and other medications.  In a follow-up visit on February 1, 2001, Claimant reported an earache, sore throat, and headache.  Dr. Ahmad prescribed Keflex. (Tr. 86A).  On March 16, 2001, Claimant called and requested an antibiotic prescription, but Dr. Ahmad would not write a prescription without seeing Claimant.  (Tr. 87).  On March 27, 2001, Dr. Ahmad treated Claimant for a boil in the roof of her mouth.  Dr. Ahmad prescribed medications.  (Tr. 87).

On September 10, 2001, during an office visit with Dr. Ahmad, Claimant reported congestion, sore throat, and a cough, and Dr. Ahmad prescribed medications.  (Tr. 87).  In a follow-up visit on September 25, 2001, Claimant reported no improvement with her flu-like symptoms.  (Tr. 88).  Dr. Ahmad prescribed Midrin and Robidrine.  Claimant reported having chronic headaches on October 18, 2001, in a follow-up visit with Dr. Ahmad.   (Tr. 88).   On October 23, 2001, Dr. Ahmad noted that Claimant had received authorization for a cat scan of her head.  (Tr. 89).   In a follow-up visit on November 27, 2001, Claimant reported headaches, back pain, and chest pain.  Dr. Ahmad prescribed Elavil, Floxin, Skelaxin, and other medications.  (Tr. 89).  Dr. Ahmad prescribed physical therapy treatment through January 5, 2002, for Claimant's neck and shoulder pain.  (Tr. 96-97).  The physical therapist at Christian Northeast Hospital noted on December 7, 2001, how she called Claimant on November 15, 2001, after Claimant failed to show up for treatment and requested Claimant to call back and schedule an appointment.  (Tr. 98).  The physical therapist noted that Claimant did not respond to the call and may have benefitted from therapy by decreasing her neck and arm pain.  (Tr. 98).

On February 5, 2002, Claimant returned to Dr. Ahmad's office to discuss her medications. (Tr. 90).  In a follow-up visit on April 5, 2002, Claimant reported hoarseness caused by her

yelling at her daughter.  Dr. Ahmad ordered Claimant to rest her voice.  (Tr. 90).

On July 31, 2002, Claimant sought treatment in the emergency room at Forest Park Hospital for right head and face burning.  (Tr. 134-35).  The examining doctor diagnosed Claimant with acute sinusitis and prescribed Sudafed OTC, Augmentin, Tylenol PRN, and Allegra.  (Tr. 136).

Claimant called and cancelled her appointment with Dr. Ahmad scheduled on September 9, 2002.  (Tr. 91).  On October 2, 2002, Claimant failed to show up for her scheduled appointment.  (Tr. 91).

On referral by Susan Ryan, Claimant's DVR counselor,  Dr. John Hogg, Ph.D., completed a psychological evaluation of Claimant's cognitive and academic skills and emotional status.  (Tr. 146-53).  Dr. Hogg reviewed limited medical records provided by Claimant's DVR counselor. (Tr. 146).  Claimant reported working the last three to four months at Forest Park Community College library.  (Tr. 147).  Claimant reported frequent, daily headaches, hypertension, and depression.  Claimant listed her medications as Atenolol, Triamterene, Zocor, Ibuprofen, vitamins B and E, and aspirin.  Claimant noted that she takes Allegra on an as needed basis and having a prescription for diazepam but not taking the medication.  (Tr. 147).  Dr. Hogg opined that psychologically, Claimant evidenced a normal range affect.  (Tr. 148).  Claimant reported low, dysphoric mood, irritability, a feeling of wanting to be left alone, low energy level, poor appetite, and poor sleep.  Test results revealed borderline measured verbal intellectual functioning and low average nonverbal intellectual functioning.  Dr. Hogg made provisionally the diagnosis of Borderline Intellectual Functioning.  (Tr. 148).  Dr. Hogg opined that Claimant evidenced current major depressive disorder.  (Tr. 149).  In assessing the results of the Personality Assessment

Inventory, Dr. Hogg opined that Claimant "produced an invalid profile, not allowing clinical interpretation. Similar marked elevations on the Negative Impression scale are associated with attempts to present oneself in an especially negative manner." (Tr. 149). Claimant admitted that she recently discontinued antidepressant medications. Dr. Hogg strongly recommended that Claimant resume comprehensive mental health treatment including antidepressant medications and psychotherapy for depression. (Tr. 149-50). Dr. Hogg opined that Claimant would do "best on vocational and training tasks which do not require advanced academic skills" with demonstration based training methods. (Tr. 150).

On November 11, 2002, Claimant cancelled her appointment with Dr. Ahmad. (Tr. 91). On January 3, 2003, Claimant failed to show up for her scheduled appointment. (Tr. 91). On February 8, 2003, Claimant reported a headache and nose congestion. (Tr. 92). Dr. Ahmad prescribed medications. On March 10, 2003, Claimant cancelled her follow-up appointment. Claimant cancelled her urgent appointment March 14, 2003. Claimant sought treatment on March 17, 2003, for severe pain in her upper back and pain in the left side of her neck. Dr. Ahmad prescribed Ultram and other medications. (Tr. 92).

On March 16, 2003, Claimant received treatment at Forest Park Hospital for muscle spasms and back pain. (Tr. 143-45). The treating doctor prescribed Soma. (Tr. 144).

Claimant called Dr. Ahmad's office on March 19, 2003, and reported how the pain medications were not working and inquiring what she should do. (Tr. 93). Claimant was directed to schedule an appointment, but she cancelled the appointment on March 21, 2003, because she sought treatment in the emergency room. (Tr. 93).

On March 21, 2003, Claimant sought treatment in the emergency room at Christian

Northeast/Northwest Hospital. (Tr. 107, 124). Claimant reported back pain of eight days duration as her chief complaint. (Tr. 108). After waiting for treatment in the emergency room, Claimant walked out and stated that she was going home because receiving treatment was taking too long. (Tr. 110). Claimant returned to the emergency room for an x-ray of her chest and cervical spine on March 22, 2003. (Tr. 125-26). The x-ray revealed a normal chest but degenerative changes predominantly at the C5-6 level of Claimant's cervical spine. (Tr. 125-26).

Claimant returned to the emergency room at Christian Northeast/Northwest Hospital on March 25, 2003, complaining of left shoulder pain and pain. (Tr. 115-117, 128-31). Claimant reported a history of hypertension, high cholesterol, and depression. (Tr. 128). The examining doctor listed DJD of cervical spine as the clinical impression. (Tr. 117). In the discharge instructions dated March 26, 2003, Dr. Joaquin Guzon instructed Claimant on osteoarthritis and home care treatment instructions. (Tr. 118). Dr. Guzon prescribed Panlor DC as treatment. (Tr. 132). In the x-ray report of Claimant's shoulder and chest taken on March 26, 2003, the radiologist noted normal left shoulder and normal chest. (Tr. 112-13). In the discharge report dated April 4, 2003, cervical RIB/DJD cervical spine are listed as Claimant's diagnosis. (Tr. 111).

In a follow-up visit on March 28, 2003, Claimant received treatment for her shoulder pain. (Tr. 93). Dr. Ahmad diagnosed Claimant with degenerative disc disease and prescribed physical therapy and Lodine, Soma, and Robaxin. (Tr. 93).

On March 28, 2003, Claimant sought treatment in the emergency room at Forest Park Hospital for neck, left shoulder pain, and blood in her urine. (Tr. 140, 142). Claimant was diagnosed with menorrhagia and perimenopause. (Tr. 140). Claimant reported going to the

emergency room five times in the last twelve days. (Tr. 142).

On April 1, 2003, Claimant called Dr. Ahmad's office and reported being treated in the emergency room and receiving the recommendation for hormone therapy. Dr. Ahmad referred Claimant to an OB/GYN for treatment. (Tr. 93).

On referral by Disability Determinations, Dr. Thomas Davant Johns, Ph.D., completed a psychological evaluation of Claimant on May 8, 2003, to be used in determining the presence and extent of possible disability due to headaches, high blood pressure, and high cholesterol. (Tr. 154-60). Dr. Johns noted that Claimant was a fair minus to marginal historian, because she was nominally cooperative but irritable and defensive making the interview difficult. (Tr. 154, 157). Claimant reported first experiencing depression during childhood. (Tr. 154). Dr. Ahmad is treating Claimant's depression, and she is taking Wellbutrin. (Tr. 155). Claimant reported the Wellbutrin helping although she still is crabby. Dr. Johns opined that Claimant rates the severity of her depression significantly in excess of her presentation. (Tr. 155). Claimant reported in every employment situation she has experienced interpersonal difficulties with arguing and fighting causing her to quit her jobs. (Tr. 156). Claimant reported tasting alcohol in the past but never using it to any significant degree. (Tr. 156-57). In the next paragraph, Claimant admitted to participating in an alcohol and drug treatment program on one occasion twelve-years earlier. (Tr. 157). As to daily activities, Claimant reported being able to do cooking, cleaning, grocery shopping, and laundry. (Tr. 158). Claimant has a driver's license and primarily drives herself, but she is capable of using public transportation independently if need be. Claimant is enrolled in two classes but only attends one class twice a week. Claimant reported no longer attending church. (Tr. 158). Dr. Johns noted that Claimant's social functioning is markedly impaired inasmuch as

she is socially isolated. (Tr. 159). Dr. Johns determined that Claimant would be mildly impaired in her ability to complete simple tasks in a timely manner over a sustained period of time. Dr. Johns found Claimant to have major depressive disorder and borderline personality disorder. (Tr. 159).

On referral by Disability Determinations, Dr. Loreta Mendoza, completed an internal medicine examination of Claimant on May 8, 2003. (Tr. 161-67). Claimant reported experiencing headaches for the last ten years everyday for one to three hours. (Tr. 161). Dr. Mendoza noted that Claimant did not exhibit any sign of sleepiness during the examination, but Claimant was very hostile and aggressive. (Tr. 161). Dr. Mendoza noted that Claimant has high blood pressure and high cholesterol. (Tr. 162). Claimant reported back pains during the examination, but Claimant refused to complete a range of motion examination based on an earlier experience of being incapacitated for several days after completing a range of motion examination. (Tr. 162). Examination of Claimant's back revealed no tenderness to palpation. (Tr. 163). Dr. Mendoza noted as follows at the end of the examination report:

> The claimant started to get upset when by chance she mentioned to me that she is a student. When I was trying to ask her how many credit hours she is taking is when she started to get upset. When she got upset I did not persist to ask her anymore and just asked her to let me do the exam.

(Tr. 163).

In the Mental Residual Functional Capacity Assessment completed on May 27, 2003, Dr. Ofelia Gallardo, a medical consultant, found Claimant to be not significantly limited in any areas of work-related mental functioning except for moderate limitations in her ability to work in coordination with or proximity to others without being distracted by them, to interact

appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. (Tr. 168-69). Dr. Gallardo opined that Claimant could perform better in setting not requiring high social interaction. (Tr. 170).

In the Psychiatric Review Technique completed by Dr. Gallardo on behalf of Disability Determinations, on May 27, 2003, Dr. Gallardo noted the presence of borderline intellectual functioning, major depressive disorder (recurrent, mild with medication), borderline personality disorder, and substance addiction by history in remission. (Tr. 172). In rating Claimant's functional limitations, Dr. Gallardo found Claimant to have marked limitations with difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 182). In the credibility statement, Dr. Gallardo opined as follows:

> The clmt told the CE evaluator that she has problems with memory and concentration, a loss of interest in everything. She stated on her ADLs that she can't sit, read, concentrate and she has problems following directions. Yet, at her general medical CE she told the doctor that she was in school full time for Business Administration. She got extremely hostile with the examining doctor when she asked more questions regarding her school. She even threatened to get dressed and leave the exam if she was asked any further questions. There is obvious inconsistencies with her being in school "full time" and not being able to concentrate, read, sit, etc. However, she does exhibit the symptoms of her diagnosis. Therefore, the clmt's statements and reported symptoms appear to be partially credible.

(Tr. 184). Thus, Dr. Gallardo determined that Claimant's statements as partially credible based on Claimant exhibiting the symptoms of her diagnosis. (Tr. 184).

Starting on November 1, 2003, Dr. George Flanigan, Jr., a gynecology specialist and surgeon, treated Claimant five times in November for a sinus problem and delayed menstrual

cycles. (Tr. 186-88). Dr. Flanigan noted that Claimant has hypertension, premenopause, anxiety, and sinusitis. (Tr. 186-88). As treatment, Dr. Flanigan prescribed Valium and other medications. (Tr. 187-88). On December 6, 12, 20, and 27, 2003, Dr. Flanigan treated Claimant's hypertension, cold, fever, and sinus headaches by prescribing medications. (Tr. 189-90). On January 3, 10, 24, and 31, 2004, Dr. Flanigan treated Claimant's hypertension and gastritis and prescribed medications. (Tr. 191-93). On January 17, 2004, Claimant failed to show up for her scheduled appointment and Dr. Flanigan noted that Claimant had failed to have a pregnancy test done as requested. (Tr. 192). On January 31, 2004, Dr. Flanigan noted that Claimant still had not taken the pregnancy test. (Tr. 193).

In a follow-up visit on February 10, 2004, Dr. Flanigan noted that Claimant still had not completed the pregnancy test and Dr. Flanigan treated her hypertension. (Tr. 193). On February 17, 2004, Claimant reported feeling better and not having a headache. (Tr. 194). Dr. Flanigan treated Claimant's hypertension and anxiety with medications. (Tr. 194).

Dr. Flanigan prescribed medications for Claimant's headache, hypertension, and anxiety on March 2, 2004. (Tr. 194). In the return visit on March 9, 2004, Claimant reported feeling okay and not experiencing any headaches. (Tr. 195). Claimant reported being depressed on March 24, 2004. (Tr. 195).

In a follow-up visit on April 16, 2004, Claimant complained of a sore throat, cough, and headache. (Tr. 196). Dr. Flanigan diagnosed Claimant with bronchitis and pharyngitis and prescribed medications. Claimant reported having a headache on May 1, 2004, and on May 21, 2004, Claimant called the office reporting that headache pain had increased. Claimant was directed to go to the emergency room if she felt she could not wait to be treated by Dr. Flanigan,

because he was not available.  (Tr. 196).  Claimant returned to Dr. Flanigan's office on May 22, 2004, complaining of a headache and right arm pain.  (Tr. 197).  Dr. Flanigan diagnosed Claimant with hypertension and anxiety and prescribed medications.  (Tr. 197).

On May 30, 2004, Claimant received treatment in the emergency room at St. Mary's Health Center for shaking with a low-grade temperature, chills, and increased bowel movements.  (Tr. 200-08).  Claimant reported taking blood pressure medications.  (Tr. 206).  Claimant denied having a headache at that time.  (Tr. 206).  Claimant left the emergency on her own will before being completely evaluated and treated.  (Tr. 201, 205).  Claimant explained to a nurse that she had to pick up something by 10:00 p.m. and did not want to wait for lab results.  (Tr. 205).

In a follow-up visit on June 1, 2004, Claimant reported a headache and throat drainage, and Dr. Flanigan prescribed Tylenol #2 in addition to other medications.  (Tr. 197).  On June 22, 2004, Dr. Flanigan prescribed Tylenol #3 as treatment for Claimant's headache.  (Tr. 198).  Claimant reported feeling better and having not as severe headaches on June 30, 2004.  Dr. Flanigan prescribed medications.  (Tr. 198).  On July 19, 2004, Claimant reported vaginal discharge, and Dr. Flanigan's diagnosis included vaginitis.  (Tr. 199).

On September 17, 2004, Dr. Rolando Larice prescribed Lexapro, Topamax, and Restoril, and noted that the medications will cause her to be tired at the beginning of treatment.  (Tr. 209).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the nondisability requirements and is insured for disability benefits through September 30, 2004, and thus Claimant must establish disability on or prior to that date.  (Tr. 23).  The ALJ found that Claimant has not engaged in substantial gainful activity since October 1, 2002, the alleged onset date of disability.  The ALJ found that the

medical evidence establishes that Claimant has severe impairments of depression and anxiety, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4, or an impairment or limitation meeting or equaling the C Criteria of Listing 12.02, 12.03, 12.04, or 12.06. The ALJ determined that Claimant has only mild restrictions of daily activities and difficulties in maintaining social functioning. The ALJ opined that Claimant has moderate difficulties in maintaining concentration, persistence, or pace if required to do detailed or complex work, but she has only mild restrictions if restricted to unskilled tasks that can be learned within thirty days. The ALJ noted that Claimant has had no episodes of decompensation of extended duration. The ALJ found that Claimant's allegations of limitations precluding all substantial gainful activity are not totally credible for the reasons set forth in his decision. (Tr. 23).

The ALJ further found that Claimant has the residual functional capacity to perform simple repetitive work, and she has no severe physical limitations. (Tr. 23). The ALJ opined that Claimant is unable to perform any of her past relevant work, but her ability to perform unskilled work at all exertional levels is not impaired. The ALJ noted that Claimant is a younger individual with at least a twelfth grade education. The ALJ determined that the issue of whether Claimant has transferable skills is not material to his determination. (Tr. 23).

Considering the types of work which claimant is still functionally capable of performing in combination with her residual functional capacity, age, and, education, the ALJ opined that Claimant is not disabled. (Tr. 23). The ALJ thus concluded that Claimant was not under a disability at any time through the date of his decision. (Tr. 23).

## V.     Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If he is, then he is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If he is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, he is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, he is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will he be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ erred in properly assessing the weight given to the medical evidence. Claimant further contends that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ failed to call a vocational expert.

A.     <u>Weight Given to Physician's Medical Opinions</u>

Claimant contends that the ALJ improperly discredited the physician's medical opinions regarding her social limitations. In particular, Claimant contends that the ALJ should have accorded more weight to the opinions of Drs. Johns and Gallardo. The ALJ did not accord significant weight to their assessments concerning Claimant's social limitations and borderline personality because their assessments were inconsistent with the medical record as a whole. As noted by the ALJ, Dr. Gallardo's opinions relied heavily on Dr. Johns' opinion which was inconsistent with the record as a whole.

In the instant case, the ALJ determined to give Drs. John and Gallardo's opinions neither controlling weight nor much deference because they were non-treating physicians who evaluated

Claimant one time and their opinions were inconsistent with the record as a whole.  See Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) ("A one-time evaluation by a non-treating physician is not entitled to controlling weight.").  The ALJ gave good reasons for such determinations, and such reasons are supported by substantial evidence on the record as a whole.  See Pierce v. Apfel, 173 F.3d 704, 707 (8th Cir. 1999) (ALJ may reject conclusions of any medical expert if they are inconsistent with evidence as whole).  The ALJ noted that no other physician or psychologist had diagnosed Claimant with personality disorder.  Loving v. Department of Health & Human Servs., 16 F.3d 967, 971 (8th Cir. 1994) (one-time nontreating psychologist's evaluation given little weight when reports were conclusory and lacked supporting evidence); See Popp v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986) ("The ALJ is required to examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior.").  Further, the ALJ noted that "[a]lthough the claimant was hostile and aggressive when seen by both Mr. [*sic*] Johns and consultative physician Dr. Mendoza on May 8, 2003, the claimant did not display similar behavior when seen by Dr. Hogg."  (Tr. 20).  Likewise, the ALJ cited how the treating medical record does not contain any instances of hostility or aggressive behavior.  Indeed, the ALJ cited to the results of the Personality Assessment Inventory administered by Dr. Hogg showed an invalid profile and potentially consistent with attempts to present oneself in an especially negative manner.  Moreover, the results of Dr. John's mental examination revealed only mild difficulties with completing simple tasks in a timely manner over a sustained period.

The ALJ further noted that the evidence in the record tends to militate against the assessment of borderline intellectual functioning.  In support, the ALJ cited to Claimant's past work and level of education.  As noted by the ALJ, Claimant successfully completed training as a

nurse's aide and truck driver in addition to college courses.  Thus, the ALJ did not err in according Drs. Johns and Gallardo's assessments little weight.

The substantial evidence on the record as a whole  supports the ALJ's decision.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

Finally, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make.  Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000).  This is even so when the medical evidence is in conflict.  Id.  In the instant cause, the ALJ gave good reasons to discount the disability assessments rendered by Drs. Johns and Gallardo inasmuch as their assessments were not supported by substantial medical evidence on the record as a whole.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.    Vocational Expert Testimony

Claimant contends that the ALJ's decision is not supported by substantial evidence because it lacks vocational expert testimony.  This claim is without merit.

Generally, when a claimant has a nonexertional impairment that limits her ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ must obtain testimony from a vocational expert in order to satisfy the Commissioner's burden at step five of the sequential evaluation process.  Hall v. Chater, 62 F.3d

220, 224 (8th Cir. 1995); Groeper v. Sullivan, 932 F.2d 1234, 1235 n.1 (8th Cir. 1991). Where, however as here, the ALJ properly considered the extent to which the nonexertional impairments diminish or significantly limit Claimant's residual functional capacity to perform a full range of activities listed in the guidelines, the ALJ is not required to consult with a vocational expert and may properly rely on the vocational guidelines at step five. Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993); Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988). If the claimant's characteristics do not differ significantly from those contemplated in the Medical-Vocational Guidelines, the ALJ may rely on the guidelines alone to direct a finding of disability. Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson, 850 F.2d at 349-50. Inasmuch as the ALJ's determination that Claimant had nonsevere mental impairments was supported by substantial evidence, the ALJ properly relied upon the guidelines to make the finding that Claimant was not disabled. Id. at 349 ("[I]f the ALJ determines that a claimant's nonexertional limitations do not affect the claimant's residual functional capacity then the ALJ may rely of the Guidelines to direct a conclusion of either disabled or not disabled without resorting to vocational expert testimony.").

As outlined above, the ALJ sufficiently limited his RFC determination to only the limitations he found credible based on his evaluation of the entire record. The medical record supported the ALJ's determination that Claimant could perform simple, repetitive work. Thus, the ALJ committed no error by using the Medical-Vocational Guidelines to determine whether

Claimant was disabled.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed and that Claimant's complaint be dismissed with prejudice.

Dated this  29th  day of September, 2006.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE